TERRI KEYSER-COOPER
Law Office of Terri Keyser-Cooper
Nev. Bar #3984
3590 Barrymore Dr.
Reno, NV 89512
Tele (775) 337-0323
*Attorney for Plaintiff Lauren Kettell*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

LAUREN KETTELL,

      Plaintiff,

      vs.

WASHOE COUNTY DEPUTY
BRENT COSS,

      Defendant.

_____/

Case No.

**COMPLAINT**
**JURY DEMAND**

## JURISDICTION AND VENUE

1. This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201; 42 U.S.C. §§ 1983 and 1988; and pendent state claims.

2. Venue in this action is appropriate in the District of Nevada pursuant to 28 U.S.C. Section 1391(b).

## PARTIES

3. Plaintiff LAUREN KETTELL is a resident of San Mateo, California.

4. Defendant BRENT COSS is and at all relevant times was a Washoe County Sheriff's Deputy acting under color of law.

1

5. Plaintiff alleges that the defendant performed, participated in, aided and/or abetted in some manner the acts averred herein, proximately causing the damages averred below and is liable to her for the damages and other relief sought herein.

**FACTUAL ALLEGATIONS**

6. On July 2, 2011 at approximately 11:15 a.m., plaintiff KETTELL, 19, a University of San Francisco student, was visiting her grandparents' beach front home in Incline Village in preparation for the July 4th celebration.[1] Accompanied by her boyfriend Chandler Pessah ("Pessah"), the two went into Lake Tahoe on borrowed paddleboards. KETTELL, tall, slender, and attractive wore sunglasses and a bikini. Pessah wore swim trunks. Like the majority of paddle boarders on the lake, they did not wear life jackets.

7. Entering the water they first paddled east towards a designated public swim zone marked in front of Incline Beach. As they attempted to enter the swim zone, a lifeguard told them they could not enter the swim zone on paddleboards. They turned around and headed back towards KETTELL's family home.

8. KETTELL and Pessah were paddling west, in the direction of where they first came from, when COSS on an M-9 boat with four other men yelled at KETTELL and Pessah to turn around and get life jackets. KETTELL responded, "Okay, we are already on our way back home," as she pointed northwest towards her family home. "Our life jackets are on shore and we'll go get them. Thank you."

9. At no time did KETTELL or Pessah object to returning to shore to retrieve life jackets. KETTELL was polite, appropriate, and at all times courteous, she had no reason not to be—she had no prior problems with law enforcement and had been raised to respect the law. To be helpful, she pointed directly at her grandparents' house, indicating exactly where they would go to get the jackets.

10. COSS, seemingly mollified, nodded his head when KETTELL pointed where she and Pessah would be heading. He did not ask for additional information or advise either KETTELL or Pessah they were under arrest and he did not threaten them with tickets or penalties. Instead, he seemed agreeable to their proceeding to the beach to get life jackets. At all times, by his words and

---

[1] Her grandparents, Mr. and Mrs. Tomas Leonardini Sr., live at 907 Lakeshore, Incline Village, Nevada.

2

1  actions, COSS lead KETTELL and Pessah to believe that if they complied with his directive to get life
2  jackets, they would be in full compliance with his orders. COSS turned is boat around and went about
3  his business.

4        11. KETTELL and Pessah continued heading west, paddling directly back to the
5  grandparents' home. It was their intention to get the jackets and return to the lake for more paddle
6  boarding. The jackets were located in a bin on the beach at the grandparents' home.

7        12. Approximately four minutes later, when they were approximately 50-75 yards from the
8  home of KETTELL'S grandparents and their destination,[2] COSS' boat was again upon them, charging
9  them. An unsafe situation quickly developed. KETTELL lost her balance, dropped to her knees, and
10 suddenly found herself sitting on her legs, kneeling and grabbing desperately at the front of the
11 paddleboard with both hands trying to stabilize the board and keep it from plunging her into the lake.
12 As she kneeled, her breasts became more exposed while COSS and the men on his boat stared wide-
13 eyed, openly ogling her as if they had never before seen a woman in a bathing suit. Their lecherous
14 stares made KETTELL extremely uncomfortable. While she was uncomfortable with their stares, she
15 was also busy trying to balance herself from getting thrown into the water. It was a dangerous situation
16 that could easily have been avoided had COSS simply turned off the engine.

17       13. COSS directly and specifically yelled at KETTELL in an angry belligerent tone: "What
18 the Hell are you doing?" He seemingly failed to understand they were doing precisely what he had
19 directed them to do: go get life jackets. COSS' anger shocked KETTELL. She immediately informed
20 him they were doing precisely as he directed. KETTELL told Coss: "Our life jackets are at our house."
21 Adding, "I'm doing what you asked me to do." She again pointed to her grandparents' house and the
22 location of the bin containing life jackets. COSS stared at KETTELL, ogling her in her bikini, looking
23 at her lasciviously and ignoring Pessah who stood next to KETTELL on his paddleboard. Pessah was
24 also pointing directly to the house on the beach where the life jackets were kept.

25       14. As COSS angrily talked to KETTELL, she was startled at his sudden fury and irrational
26 tone. He had just, moments before, given her express approval to return to her grandparents' home to
27 retrieve life jackets after she had told him the life jackets were located at her grandparents' home. They

---

[2] All reference to locations is approximate and based on best information.

1 were on route, going to her grandparents' house, doing exactly what they told him they would do and
2 he was now behaving like a lunatic.

3     15. None of these men, including COSS paid the slightest attention to Pessah. They were
4 busy ogling KETTELL, staring at her transfixed. It was as if the young man was invisible, even though
5 he was standing on a paddle board next to KETTELL in his swim trunks and also without a life jacket.
6 COSS did not scream at him, question him, or stare at him in a sexual manner as he did with
7 KETTELL.

8     16. COSS, concentrating his full attention solely on KETTELL, directly instructed only her
9 to jump off the paddleboard and swim to his boat. KETTELL did not feel comfortable getting into the
10 boat alone with all of the staring lecherous men and COSS' misplaced anger—and with the boat's
11 engine idling it did not appear safe to her. In addition, since she was responsible for the borrowed
12 paddleboard, if she jumped off the board and into the water, she worried the expensive paddleboard
13 might drift away, get lost, or be damaged.

14     17. She became more distressed when COSS intentionally ignored Pessah's identical
15 conduct focusing on her alone. COSS failed to request Pessah board his boat. He also failed to
16 acknowledge, converse, or even make eye contact with Pessah. He treated KETTELL's companion as
17 if he was not on the scene when in fact he was doing exactly what KETTELL was doing and both were
18 similarly situated in every regard. It appeared to KETTELL that COSS wanted to lure her away from
19 Pessah and on to a boat with five lecherous men who were openly staring at her with lustful eyes.
20 COSS' singular invitation and distressing attention focused on her alone frightened her even more.
21 There was no rational explanation for why COSS would treat KETTELL so radically different from
22 Pessah.

23     18. While wobbling on her board, KETTELL pleaded with COSS to continue the
24 conversation on the beach, approximately 50-75 yards away. It was a tense situation: COSS was
25 screaming, the engine of his boat was creating a wake, and KETTELL was exerting effort to both
26 balance on the board and to understand why COSS had suddenly changed his mind about sending her
27 to shore to get a life vest. Both options, continuing the conversation in the midst of occurring
28 dangerous circumstances and climbing aboard COSS' boat alone raised red danger flags to KETTELL.

1  She knew she could not maneuver and was terrified of COSS and his boatload of ogling perverted
2  staring companions.

3     19. Noticeably afraid and hesitant, KETTELL suggested to COSS, as an alternative to
4  getting on his boat, that she remain on the paddleboard while holding onto the side of his boat. COSS
5  agreed. The combination of both COSS' idling boat and the gentle wind coming from the center of the
6  lake, made it difficult for KETTELL, who was a novice paddle boarder, to navigate along the side of
7  COSS' M-9. In attempting to rationally resolve the situation, KETTELL asked COSS if he had an
8  object that could extend off the side of the M-9 which she could grab for assistance in voluntarily
9  pulling herself closer to COSS so they could continue to talk. COSS looked around the boat, found a
10 hook, and extended the hook over the side in her direction. KETTELL, unable to reach the hook with
11 her arm, extended her oar to hook onto the hook COSS was holding. By so doing, KETTELL was
12 approximately six feet from COSS' boat.

13    20. COSS pulled KETTELL to the side of his boat, where she remained kneeling on the
14 paddleboard with one hand hanging onto the side of COSS' boat. COSS asked her name and she
15 provided it, spelling her name carefully. COSS also requested her birth date and she again complied.
16 She inquired: "Am I getting a ticket" and if so "Why?" Since the lake was full of paddle boarders
17 without life vests, she did not know what she had done wrong. She also asked again if she and Pessah
18 could go to her grandparents' beach house, again pointing to the house. She accurately and truthfully
19 explained in two separate conversations they were on their way to get life jackets as instructed, but
20 COSS appeared not to listen and did not respond. While they spoke she was swept dangerously close
21 to the dock.

22    21. Frightened, both of COSS, the men in the boat, and her precarious position between the
23 boat, the engine, and the wooden dock, KETTELL cried out: "You're about to run me into this dock
24 and it's going to smack my head going under the dock!" She lifted her arm to protect herself from the
25 dock, grabbing the side of the dock to prevent going underneath while still kneeling.

26    22. With a shove, KETTELL pushed away from the dock and the idling boat and yelled at
27 COSS "I cannot be here anymore," indicate the dangerousness of the situation. She asked "Can we
28 please talk on my beach" meaning the beach in front of her grandparents' clearly visible beachfront
   home where she had already pointed several times. This time she gave the full address of her

5

1  grandparents' home and watched while COSS carefully wrote down the address. She did not leave
2  until COSS knew exactly where she was going.

3      23. Still kneeling, KETTELL paddled to her grandparents' beach in a direct fashion, doing
4  exactly what she told COSS she would do.

5      24. KETTELL'S announcement that she was going to her grandparents' beach home was
6  also heard by COSS' male volunteers, who cited in their witness reports that she had provided the
7  address of the beach house where she was going, giving its complete address. She was not fleeing. She
8  was not escaping. She was not a flight risk. She was removing herself from an unsafe, escalating
9  situation while informing law enforcement of her precise intentions along the way.

10      25. As she paddled to her grandparents' home, still kneeling, KETTELL began to relax. Her
11  grandfather was home and she knew that with his assistance the conflict would be resolved while she
12  was on land in a safe location. She reasoned that whatever had just occurred was a misunderstanding
13  would soon be clarified. She trusted the police—she reasoned they were there to help and were
14  reasonable. She anticipated she would explain to COSS the life jackets were on the beach, he would
15  see the bin of life jackets, and she would immediately put one on. She had told him exactly where she
16  was going, she had given him the exact location, and she expected he would follow and they would
17  sort this issue out. If necessary she would receive a ticket.

18      26. When she arrived at her grandparents' beach she turned and saw COSS charging
19  towards the location, steering up and on to the sand in front of her, and anxiously beaching the boat
20  with a dramatic entry.  COSS leaped out of the boat, tripped, and stumbled at the water line just as
21  Pessah paddled up on to the beach. KETTELL began walking towards COSS, thinking she would
22  answer any questions he might have and they would sort out what had just occurred.

23      27. But COSS had a different idea. He charged KETTELL, seemingly blind with rage. He
24  did not say a word and did not provide a warning. Wearing her bikini, it was obvious she had no
25  weapon. At no time did she level a verbal or physical threat to COSS or to anyone else. As COSS was
26  sprinting towards her, she stood still, waiting to talk to him. He surprised her by grabbing her right arm
27  and twisting it up as far as it would go behind her back. She was immediately in intense pain. She cried
28  out, "Why are you doing this?" She had no idea why he attacked her in this manner. She did not resist,

nor could she; COSS held her tight and twisted her arm up and behind her back in a way that completely debilitated her.

28. COSS continued to assault KETTELL. He yanked her shoulder with sufficient force to cause her to face plant directly in the hot sand. The force used by COSS was strong enough to break the nose piece on her sunglasses. With her face entirely in the hot sand, KETTELL could not catch her breath. She panicked and cried out, "You're hurting me" swallowing large amounts of hot sand.

29. COSS then climbed on top of her. He put his entire weight on her slim helpless body while pushing his knee high on to her shoulder blades—causing excruciating pain. It is alleged that COSS outweighed KETTELL by approximately 100 pounds. She felt that her back was being crushed with his heavy weight while he handcuffed her, pulling and twisting her arm upwards in an extremely painful position while she inhaled hot sand and tried to breathe. As she tried to breathe, COSS gave her arm sharp pushes and pulls.

30. KETTELL remained with her face in the sand with COSS on top of her for approximately six to eight minutes, although it seemed to her far longer. COSS handcuffed her. Once, when she attempted to maneuver into a position that was slightly easier on her shoulder, COSS maliciously pushed his weight harder into her back. At no time did COSS show the slightest concern for her safety or condition. He resisted her cries of pain and kept twisting her arm as high up as it would go, while continuing to make it difficult for her to breathe. Even though she was handcuffed, face first in the sand, COSS continued to remain on top of her and would not permit her to stand.

31. Pessah, watching in horror, shouted" "Take me instead!" But COSS continued to ignore him, giving the bikini clad KETTELL his full attention as he jumped on top of her. Even though Pessah had done exactly as KETTELL had done, COSS did not focus on him. Pessah was not threatened, jumped, assaulted, battered, handcuffed, or made the object of force and derision.

32. At about this time, KETTELL's grandfather, Thomas A. Leonardini, Sr., appeared. He announced: "I am her grandfather, why are you hurting my granddaughter? Is she under arrest?" "You are hurting her, you are hurting her, and can you please relax?" COSS responded to Leonardini by aggressively pushing him way, telling him to "back off" or he would be placed under arrest. Leonardini asked the volunteers accompanying COSS for help as he perceived COSS to be out-of-control and injuring his granddaughter. The volunteers responded by insisting COSS was in charge and

there was nothing they could do. Leonardini asked Pessah to call 911 from inside his home. Pessah went running away, fleeing to make an emergency call to 911, but COSS did not pay the fleeing Pessah the slightest attention. COSS, in his official statement, untruthfully describes the encounter with the Leonardini as the older man running into him with force. This statement is manifestly false as Leonardini, 70, had polio as a young man and has one leg shorter than the other. He is not capable of running and has not run in more than 40 years.

33. COSS called for "backup." It is unclear precisely how many backup officers arrived but it is alleged on information and belief that firefighters, paramedics, and other deputies – perhaps as many as twelve told arrived. KETTELL was fearful she would be beaten by these backup officers and terrified of what they would do for her—she alternated between fear and terror as she remained face first in the sand.

34. A paramedic assisted KETTELL in rolling over so she could be helped to her feet. KETTELL's bikini top was not on all the way, as the pressure of COSS on top of her tugging at her and twisting her arm had pushed it down causing her breasts to be exposed in an embarrassing fashion. As she was handcuffed, she was unable to adjust her bikini top and a paramedic pulled the top straps up, so she would not be so exposed in front of the audience of 20 plus male officers and the approximately 10 family friends and neighbors staring at her. This unwanted attention from so many law enforcement officials and neighbors caused her extreme embarrassment and humiliation. All the while, COSS stood at her side firmly squeezing the top right part of her arm tightly as if she were a serial killer instead of someone who neglected to wear a life jacket while paddle boarding.

35. KETTELL, previously diagnosed with post traumatic stress disorder, anxiety disorder and a panic disorder was in high panic. A firefighter said to KETTELL: "I know you're upset, if you are calm and quiet like you are now, this will all be resolved." She told him her right shoulder was numb, her body hurt, and she was scratched.

36. The firefighter asked COSS to release her handcuffs so he could examine her shoulder but COSS refused, insisting it was not safe to release her, lying to the firefighter that she was trying to escape. KETTELL, in the midst of a panic attack, could not breathe and was intensely frightened, faint, and nauseated with a numb sensation throughout her body. Her shoulder was in excruciating pain.

8

37. A paramedic informed KETTELL of her right to seek immediate medical attention, suggesting it would be a good idea. A female officer announced she would be going to the hospital. Pessah ran to get her clothes as she was still in her bikini with COSS still holding her by her injured shoulder. As she drove off to the hospital, her mother also provided bag of clothes for her. At the hospital the handcuffs were removed and body chains were put on. She remained in intense pain.

38. Pessah was not arrested, cited, or threatened in any way. He was ignored by COSS and the male volunteers. While KETTELL was taken to the hospital, he remained at her grandparents' home.

39. After the hospital, KETTELL was taken to the Incline Village substation. Shortly thereafter she was taken Reno jail where charges were provided to her and where she remained for approximately six hours. It was approximately two hours before she was informed of the charges against her: resisting a public officer, failure to yield to an emergency vehicle, and operating a vessel without sufficient personal flotation devices, all misdemeanors.

40. Following the incident she was bruised for weeks with the bruises clearly showing the four fingers of COSS' hand. She saw an orthopedic surgeon who put her in a sling for six weeks and was unable to work at her full time job being a caretaker for children with Autism and lost income. The orthopedic doctor advised that her tendons were stretched and her range of motion limited directly from the "wrenching" moves caused by COSS. She had never before experienced shoulder problems. During the next several months she was on prescription pain medication and suffered difficultly in sleeping. Her emotional distress, panic, and anxiety continued far longer.

41. KETTELL was forced to retain the services of attorney Lawrence Digesti to defend her in the ensuing criminal proceeding.

42. On or about September 20, 2011, Washoe County Deputy District Attorney Aziz Merchant dismissed all charges against KETTELL.

43. At all times COSS' actions were objectively unreasonable in light of the facts and circumstances confronting him. No reasonable officer would have behaved as COSS behaved. KETTELL was clearly in a demonstrably dangerous unsafe situation caught between COSS' boat and a wooden dock—she indicated she was going to her grandparent's home, pointed in the direction she

9

1  was going, and provided the address. She went exactly where she said she would go and she went there
2  because it was dangerous for her to remain where she was.

3      44. At no time did KETTELL pose an immediate threat (or any threat) to the safety of
4  COSS or to any officer or volunteer. Wearing a bikini bathing suit, it was obvious she had no weapon
5  and at no time behaved in an assaultive manner to anyone. She did not push, strike, or shove COSS or
6  any officer. She was not a flight risk. She was surrounded by officers. She did not swing at COSS or
7  advance on him with an object. A reasonable officer in these circumstances would know it was
8  objectively unreasonable to deploy force against a slender young girl who had not threatened or
9  assaulted him in any way. A reasonable officer would know that continuing to knee her in a forceful
10 way and give her additional pushes and shoves while wrenching her arm behind her back while she lay
11 face first in the sand was malicious, cruel, and vengeful—completely unnecessary, excessive, and
12 unreasonable.

13     45. Further, keeping KETTELL face first in the hot sand after she was handcuffed was
14 extreme and unwarranted—she posed no physical threat and was completely debilitated.

15     46. At no time did COSS issue a warning that physical force would be used.

16     47. At no time was KETTELL resisting.

17     48. The character of the offense, failing to wear or have on her paddleboard a life vest is a
18 very minor crime--inherently not dangerous or violent. Virtually all paddle boarders on Lake Tahoe on
19 the day in question did not wear life jackets or carry them on paddleboards.

20     49. At no time was any force necessary or justified, at no time was the unnecessary
21 infliction of wanton pain appropriate. KETTELL was standing on her grandparent's private beach,
22 exactly where she said she would be, approaching COSS and trying to resolve a miscommunication.

23     50. COSS at no time considered less intrusive methods of affecting the arrest. Less intrusive
24 means of force were available other than throwing her face first into the hot sand, physically grabbing,
25 assaulting, twisting her body and leaping with his full weight upon her backside while she was
26 handcuffed and then pushing her down with additional shoves and pulls to maximize her pain.

27     51. At all times COSS intentionally or recklessly provoked a violent and brutal assault
28 without provocation or need.

10

52. At all times COSS was aware back up officers would be arriving on the scene. Not only did he have the assistance of four volunteer deputies, but he know additional officers including but not limited to paramedics, firefights, and Washoe County deputies would be arriving to assist him.

53. At all times COSS intentionally singled out KETTELL, discriminating against her based on gender, treating her vastly differently from her male companion. COSS ogled her, jumped on top of her, and forcefully kept his hands on her even when she was handcuffed while ignoring her similarly situated male companion. At all times COSS was aware he was inflicting pain and suffering as KETTELL periodically cried out he was "hurting her" and kept on inflicting the pain with unnecessary arm twists, pushes, and pulls. This conduct was intentional, wanton, malicious and oppressive and made with reckless indifference to plaintiff's rights.

54. The conduct by COSS constituted an unreasonable and excessive use of force and an unlawful exercise in police authority.

55. As a result of the above-described acts, KETTELL was deprived of rights and immunities secured to her under the Constitution and the laws of the United States including, but not limited to: Her right under the Fourth Amendment to be free from excessive and unreasonable force.

### FIRST CAUSE OF ACTION

**(Fourth and Fourteenth Amendments, Excessive Force – 42 U.S.C. § 1983)**

56. KETTELL realleges and incorporates each and every allegation contained in the preceding paragraphs.

57. At no time did KETTELL pose a threat to the safety of COSS or to anyone else.

58. The severity of KETTELL's purported offense in failing to have with her a life vest is the most minor of offenses.

59. Dressed in a bikini, it was readily apparent KETTELL was unarmed.

60. At no time did KETTELL level a verbal threat or physical threat to COSS.

61. At all times COSS failed to provide KETTELL with a warning that the use of force was imminent while it was entirely feasible for him to do so.

62. The use of force was excessive and unreasonable, causing physical pain and suffering for months after the incident.

11

63. By the actions described above, COSS deprived KETTELL of the following clearly established and well-settled constitutional rights:

    a. Freedom from the use of excessive and unreasonable force;

    b. Freedom from the deprivation of liberty without due process of law;

    c. Freedom from summary punishment; and,

64. COSS subjected plaintiff to these deprivations of her rights either maliciously, or by acting with a reckless disregard for whether plaintiff's rights would be violated by their actions.

65. As a direct and proximate result of the aforedescribed unlawful and malicious conduct by COSS, committed under color of law and under his authority as a Washoe County Sheriff's Deputy, KETTELL suffered substantial economic loss, medical bills, grievous bodily harm requiring medical attention, prolonged physical pain and suffering, and emotional distress. As a result, she was deprived of her right to be secure in her person against violations of her rights under the Fourth Amendment of the United States Constitution.

66. The acts of COSS were intentional, wanton, malicious and oppressive and made with reckless indifference to plaintiff's rights thus entitling plaintiff to an award of punitive damages against COSS.

## SECOND CAUSE OF ACTION

**(Pendent State Claims: Assault and Battery)**

67. Plaintiff KETTELL realleges and incorporates each and every allegation contained in the preceding paragraphs.

68. Defendant COSS forcibly touched, grabbed, and kept plaintiff subdued in a police hold that did not allow her to move and thereafter restricted her movement, holding her against her will without his permission.

69. Plaintiff KETTELL was touched, grabbed, thrown to the ground and manhandled by COSS, causing her physical injury.

70. COSS' touch to plaintiff was unwelcome.

71. At all times Plaintiff KETTELL was frightened of COSS, fearful he would be beating her, authorizing others to beat her, and harming her.

72. As a direct and proximate result of the aforedescribed unlawful and malicious conduct by COSS, committed under color of law, plaintiff suffered substantial economic loss, medical bills, grievous bodily harm requiring medical attention, prolonged pain and suffering, and emotional distress.

73. The acts of COSS as aforescribed were intentional, wanton, malicious and oppressive and made with reckless indifference to plaintiff's rights thus entitling plaintiff to an award of punitive damages against COSS.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for judgment against the defendants as follows:

1. For a declaratory and injunctive relief that the policies, practices, and acts complained of herein are illegal and unconstitutional;

2. For actual and compensatory damages from COSS, in an amount to be determined at trial;

3. For exemplary and punitive damages from COSS in an amount to be determined at trial;

4. For attorney fees and costs incurred herein;

5. For leave to amend this complaint should it become necessary;

6. For nominal damages;

7. For such other and further relief as this Court may deem appropriate.

DATED this _____ day of _____ 2012,

By: /s/ Terri Keyser-Cooper
TERRI KEYSER-COOPER
*Attorney for Plaintiff Lauren Kettell*

13